IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 9, 2022 Session

**STATE OF TENNESSEE v. JAMES LEE SIMPSON**

**Appeal from the Criminal Court for Davidson County**
**No. 2018-C-1716    Mark J. Fishburn, Judge**
_____

**No. M2021-01031-CCA-R3-CD**
_____

Following a trial, a Davidson County jury convicted Defendant, James Lee Simpson, of voluntary manslaughter, aggravated assault resulting in death, and felon in possession of a firearm, for which he received a total effective sentence of fifteen years' incarceration. On appeal, Defendant contends that: (1) the trial court erred by providing incomplete and erroneous jury instructions on the issue of self-defense; (2) the trial court erred by preventing Defendant from cross-examining a witness regarding alleged prior acts of violence by the victims in violation of both Tennessee Rule of Evidence 405 and Defendant's right to confrontation; (3) the trial court erred in refusing to instruct the jury on the defense of necessity; (4) the trial court abused its discretion in sentencing Defendant; (5) the State failed to present sufficient evidence to support convictions for voluntary manslaughter and aggravated assault resulting in death; and (6) the trial court abused its discretion by allowing the State to cross-examine a witness regarding Defendant's prior conviction for possessing a firearm after concluding that Defendant had "opened the door" to the cross-examination. Following a thorough review of the record and applicable law, we reverse Defendant's convictions and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Manuel B. Russ (on appeal), Joy S. Kimbrough (at trial), and Derrick Scretchen (at trial), Nashville, Tennessee, for the appellant, James Lee Simpson.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

This case arose out of the shooting deaths of Keon Hawkins and his stepson, Kemontanez Armstrong, on June 7, 2016. On December 2, 2016, the Davidson County Grand Jury issued a five-count indictment charging Defendant with first degree felony murder in the death of Mr. Armstrong in count 1; first degree felony murder in the death of Mr. Hawkins in count 2; aggravated assault resulting in the death of Mr. Armstrong in count 3; aggravated assault resulting in the death of Mr. Hawkins in count 4; and felon in possession of a firearm in count 5. On August 10, 2018, the grand jury issued a superseding indictment charging Defendant with first degree premeditated murder in the death of Mr. Hawkins in count 1; first degree premeditated murder in the death of Mr. Armstrong in count 2; aggravated assault resulting in the death of Mr. Armstrong in count 3; aggravated assault resulting in the death of Mr. Hawkins in count 4; and felon in possession of a firearm in count 5.

*Pretrial Hearing*

At a pretrial hearing, Defendant asserted that he had the right to put forth the violent tendencies of Mr. Armstrong and Mr. Hawkins, whom Defendant contended were the first aggressors in the shooting. He explained that various witnesses told investigators that Mr. Armstrong and Mr. Hawkins were "robbers as a duo" and that they had a "history of robbing [people] together." Defendant called Jelia Risby, the girlfriend of Mr. Armstrong, to testify. Ms. Risby agreed that, when interviewed by detectives, she told them about several robberies that Mr. Armstrong and Mr. Hawkins had committed. She said that Mr. Armstrong told her that he and Mr. Hawkins had robbed a gang member, "Lil Duty," of cash and marijuana about a month before their deaths. Ms. Risby testified that Lil Duty later threatened that "he was going to come after [Mr. Armstrong]." Ms. Risby further stated that she was present when Mr. Armstrong and Mr. Hawkins robbed a man named "Chill" in front of a house on Dickerson Road. She said that she observed the robbery while sitting in Mr. Armstrong's car and that both Mr. Armstrong and Mr. Hawkins used guns during the robbery.

Ms. Risby agreed that she told detectives she heard Mr. Armstrong and Mr. Hawkins talking about how they had "robbed a house[,]" that "Big Boy's brother put them up to some guy, and they ended up robbing the guy[,]" and that Big Boy's brother was in the house during the robbery. She said that she did not know when or where the robbery took place, the identity of the victim, or what proceeds Mr. Armstrong and Mr. Hawkins obtained from the robbery. Ms. Risby testified:

- 2 -

I really don't too much just know anything about that, but I know that it was -- it was somehow a mutual like -- well, I'm not even going to say friend, but a mutual associate that made Big Boy's brother and Big Boy connected with somebody that they ended up robbing. So I really don't -- I don't know too much about that.

Ms. Risby also testified that she overheard Mr. Armstrong and Mr. Hawkins talking on the phone about robbing somebody. She said that she heard Mr. Armstrong ask, "[D]o I need to bring my gun over to you?" She said that she did not know which robbery they were discussing. She stated, "I don't know if they were robbing someone then, or later, or before. I don't know." She agreed that she told detectives that Mr. Armstrong asked Mr. Hawkins whether Mr. Hawkins needed a gun "out of fear of [Lil] Duty, because too much weed and money was taken." Ms. Risby said that she did not recall when this phone call took place.

At the conclusion of the hearing, the trial court ruled that Ms. Risby's testimony was admissible as to what Mr. Armstrong told her about the robbery of Lil Duty and what she saw when Mr. Armstrong and Mr. Hawkins robbed Chill. The court stated:

> So I'm going to allow both of them in. I'm not going to allow anything in about this other stuff that was talked about or about [Mr. Hawkins] wanting the gun, borrow the gun, they're talking about a robbery the morning of or the night before they were both shot and killed. Certainly, there is nothing there sufficient for the [c]ourt to be satisfied that that was going on on this occasion.

*Trial*

At trial, Jason Smith testified that, on June 7, 2016, he was working from his home on Bessie Avenue in Nashville when he heard multiple gunshots coming from outside. Mr. Smith looked out of his window and saw someone walking quickly up Bessie Avenue towards Fern Avenue wearing a dark-colored hooded sweatshirt and dark pants and carrying a black handgun. Mr. Smith also saw someone lying on the ground at a house across the street, and he called 911.

Cedric Haslett testified that he and Mr. Hawkins had been friends since 2003 and that he knew Mr. Armstrong through Mr. Hawkins. Mr. Haslett stated that, on June 7, 2016, he was at his residence on Bessie Avenue with his girlfriend, Kathy Baker, and her two children when Mr. Hawkins came over unexpectedly around 9:00 a.m. Mr. Haslett estimated that he and Mr. Hawkins spent about forty-five minutes watching videos and talking before Mr. Hawkins exited the residence because Mr. Armstrong was arriving. Mr.

- 3 -

Haslett followed Mr. Hawkins out onto the porch and saw Mr. Armstrong get out of the passenger side of a vehicle. Mr. Haslett went back inside his residence, leaving Mr. Hawkins and Mr. Armstrong outside. About fifteen minutes later, Mr. Haslett heard approximately fifteen gunshots. He testified that he pushed Ms. Baker to the ground as bullets began entering his residence. Mr. Haslett said that someone then came to his front door and attempted to open it but that he held the door closed. Once the shooting stopped, Mr. Haslett went outside and saw a man running up Bessie Avenue dressed in dark clothing. On the passenger side of Mr. Hawkins' truck, Mr. Haslett saw Mr. Armstrong lying on the ground convulsing and unable to speak. Mr. Haslett then went to check on Mr. Hawkins, who was lying on the driver's side of the truck, but Ms. Baker told Mr. Haslett that Mr. Hawkins had "already passed." Mr. Haslett testified that Ms. Baker called 911 and then began calling family members of Mr. Hawkins and Mr. Armstrong.

On cross-examination, Mr. Haslett recalled that Mr. Armstrong's girlfriend, Jelia Risby, came to the scene after the shooting and accused him of setting up Mr. Hawkins and Mr. Armstrong, which he denied. When interviewed by police later, Mr. Haslett told police that he knew Mr. Armstrong was "a robber" and that Mr. Armstrong robbed people Mr. Armstrong knew. Mr. Haslett said that he did not know Defendant and did not see him on the day of the shooting.

Officer Darryl Morton of the Metropolitan-Nashville Police Department (MNPD) testified that, on the day of the shooting, he was on patrol when he was dispatched to the location of the 911 call at the corner of Bessie Avenue and Weakley Street. Officer Morton, who was the first officer to arrive on Bessie Avenue, saw both Mr. Hawkins and Mr. Armstrong lying on the ground on opposite sides of a vehicle parked in the driveway. Mr. Hawkins had a .380 caliber handgun in his right hand with his finger "still slightly on the trigger." Officer Morton testified that neighbors began coming out of their residences, so he secured the gun, while wearing gloves, and put it in the trunk of his sergeant's car once she arrived.

Julie Riggs testified that she worked as a patrol sergeant for the MNPD on June 7, 2016, when she responded to the scene of the shooting. Sergeant Riggs spoke to Officer Morton, who informed her that there were two gunshot victims and that one of the victims was deceased while the other was about to be transported to Vanderbilt Medical Center. Sergeant Riggs took possession of the firearm recovered by Officer Morton and placed it in the trunk of her patrol car. While she was on the scene, Sergeant Riggs learned that a person had arrived at a nearby hospital with a gunshot wound, so she arranged for detectives to go to the hospital to investigate whether the person had been involved in the Bessie Avenue shooting.

Kathy Baker testified that she was Mr. Haslett's girlfriend and that she resided with him on Bessie Avenue on the day of the shooting. Regarding that day, Ms. Baker recalled that Mr. Hawkins arrived unexpectedly at her home and that, when Mr. Armstrong arrived at the residence later, Mr. Hawkins went outside to talk to him. Ms. Baker said that, about ten minutes later, at 11:23 a.m., she received a phone call from her daughter and that, as she was answering the phone, she heard gunfire. Ms. Baker testified that she sought safety as bullets began penetrating the house. She said that she then looked out of a window and saw Mr. Hawkins fall to the ground near his truck. Ms. Baker said that, prior to the shooting, she saw two men walking down the sidewalk going towards Brick Church Pike but that she did not recognize either man. After the shooting, Ms. Baker witnessed a man dressed in all black clothing running up Bessie Avenue. She went outside and saw both Mr. Hawkins and Mr. Armstrong on the ground. She first checked on Mr. Hawkins but found that he was "already gone." She then tended to Mr. Armstrong, who was "convulsing," and she called 911.

Jelia Risby testified that, at the time of the shooting, she was Mr. Armstrong's girlfriend. She said that they had two children and had been in a relationship for a long period of time. Ms. Risby did not believe that Mr. Armstrong knew Defendant, and she did not think Mr. Armstrong had a social media connection to Defendant. She testified that, on the day of the shooting, she took Mr. Armstrong to Mr. Haslett's house to meet Mr. Hawkins. She said that she left Mr. Haslett's house at 11:22 a.m. Approximately thirty minutes later, Ms. Risby learned from Ms. Baker that Mr. Hawkins and Mr. Armstrong had been shot. Ms. Risby returned to Bessie Avenue and cooperated with the resulting investigation.

Ms. Risby acknowledged that Mr. Hawkins and Mr. Armstrong had "robbed people before" and that Mr. Armstrong had a prior conviction for robbery. Ms. Risby stated that, a few weeks prior to the shooting, Mr. Armstrong told her about a robbery committed by him and Mr. Hawkins of a person called "Lil Duty," who was in the same gang as Mr. Armstrong. Mr. Armstrong told Ms. Risby that they stole money and marijuana from Lil Duty and then ran from the scene. He said that, when they were running, "somebody started shooting at them[.]" Ms. Risby said that she knew Mr. Armstrong had a gun during this robbery but that she did not know if Mr. Hawkins had one. Ms. Risby testified that, prior to his death, Mr. Armstrong was concerned that Lil Duty would retaliate for the robbery.

Ms. Risby testified that she was present during another robbery committed by Mr. Armstrong and Mr. Hawkins about two weeks before their deaths. She said that she was sitting in the car watching as Mr. Armstrong and Mr. Hawkins robbed a man. She stated that both Mr. Armstrong and Mr. Hawkins had a gun and that they pointed their guns at

the victim of the robbery. She explained that Mr. Armstrong typically carried a .380 caliber gun.

Ms. Risby explained that, about a week after the deaths of Mr. Armstrong and Mr. Hawkins, she learned from Mr. Armstrong's social media page that the man Mr. Armstrong and Mr. Hawkins robbed went by the name "Chill." On Chill's social media page, she saw numerous videos of Chill and Defendant together. She said that, after the robbery, Chill repeatedly threatened to retaliate against Mr. Armstrong and Mr. Hawkins.

Ms. Risby testified that Mr. Armstrong had about $1200 to $1500 on him the day of the shooting and that he had two cell phones. She said that Mr. Armstrong always carried a firearm despite being a felon. Ms. Risby said that she did not learn more information about Chill until after she had already spoken with the detectives investigating the shooting. She said that she later informed detectives about the connection.

Dane Obuchowski testified that, on June 7, 2016, he was at his home on Aline Avenue, a street a short distance from Bessie Avenue, when he heard a series of six to eight gunshots. Mr. Obuchowski went out on his back deck and saw a man with a silver handgun running through the back yard of the house next to his. He said that the man pointed the gun at a dog in the yard and appeared ready to shoot the dog. Mr. Obuchowski testified that he saw the man's face and that, based on the amount of time he had seen the man, he felt that he could provide police with a positive identification. He called 911 and later identified Defendant in a photographic lineup as the man he saw with the silver handgun. Mr. Obuchowski agreed that it took him some time to make the identification and that he told detectives, "[I]f the guy is in this one, I think the guy who most resembles the guy who I had seen, if he's in this one, would be [number] 5."

Officer Kenneth Wolfe testified that he worked as a crime scene investigator with the MNPD on June 7, 2016, and that he collected certain items of evidence from the scene of the shooting and photographed the scene. Officer Wolfe said that he found multiple cartridge casings in the street and observed two bullet holes in the windshield of Mr. Hawkins' truck. Officer Wolfe recovered two .380 caliber bullets at the scene. He also collected the .380 caliber Smith and Wesson from the trunk of Sergeant Riggs' patrol car.

Officer George Bouton, a crime scene investigator with the MNPD, testified that he responded to the scene of the shooting and first created an accurately scaled sketch of the scene. He then collected twelve total cartridges fired from two different guns. Officer Bouton explained that eight cartridges were from a .40 caliber Smith and Wesson and that four cartridges were fired from a .380 caliber gun. He said that he collected two of the .380 caliber casings inside Mr. Hawkins' truck. He also collected a cell phone from the scene.

MNPD Detective Gary Shannon testified that he responded to the scene of the shooting and that, initially, his role was to canvass the area for witnesses. He was later dispatched to Saint Thomas Midtown Hospital, where Defendant had arrived with a gunshot wound. At the hospital, Detective Shannon first spoke with Defendant's girlfriend, Seira Matlock, about the shooting. Ms. Matlock said that she and Defendant were driving on Village Trail when she heard a gunshot and that Defendant told her that he had been shot in the arm. Detective Shannon then talked to Defendant, who said that he was driving with Ms. Matlock down Village Trail when he heard a gunshot. Ms. Matlock then told Defendant that he had been shot in his arm. Defendant admitted that, prior to being shot, he had been driving in the area of Bessie Avenue. Detective Shannon testified that Defendant's answers made him a suspect in the detective's mind.

Detective Shannon testified that he spoke to Ms. Matlock a second time while they were at the hospital and that she "changed her story." She said that Defendant had called her and told her to pick him up on Village Trail and that she was not driving with him. She said that she drove to Village Trail and picked him up and that she was not present for the shooting. Ms. Matlock's "story changed again" when Detective Shannon spoke to her a third time. Ms. Matlock stated that she had been at Waffle House when Defendant called and asked her to pick him up. Ms. Matlock consented to a search of her vehicle, but Detective Shannon did not find clothing or a firearm in the vehicle. Ms. Matlock then drove with detectives to show them where she picked up Defendant that day. The location, at the corner of Roger Avenue and Baptist World Center Drive, was within walking distance of the crime scene.

Detective Shannon eventually obtained a search warrant to collect the bullet after it was surgically removed from Defendant's arm. He did not remain until the bullet was extracted, but he collected Defendant's cell phone as evidence. Further, Detective Shannon attended the autopsy of Mr. Armstrong and collected a bullet that was recovered from Mr. Armstrong's body.

Dr. Keith Douglas, an orthopedic physician, testified via a sworn deposition. Dr. Douglas stated that, on June 7, 2016, he operated on Defendant and removed the bullet from Defendant's arm that was then collected by an officer from the MNPD.

Sergeant Nicholas Kulp with the MNPD testified that, after obtaining a search warrant to extract the bullet from Defendant, he sat in during Defendant's surgery. After the bullet was removed from Defendant's arm, Sergeant Kulp collected it and transported it to the department's property room.

Defendant's girlfriend, Seira Matlock, testified for the State. She explained that Defendant was the father of her child and she had been in a relationship with Defendant

for "a couple of years." Ms. Matlock explained that her birthday was June 6th, the day before the shooting. Ms. Matlock got very intoxicated on the evening of June 6, so Defendant drove her back to his mother's house. The next morning, Ms. Matlock went to a Waffle House on Trinity Lane to eat. While she was waiting for her food, Defendant called her and told her to pick him up on a nearby street. Ms. Matlock picked up Defendant on Baptist World Center Drive, and she noticed he had either a t-shirt or a towel wrapped around his arm. Defendant told her that he had been shot, and she saw "a little blood." Ms. Matlock testified that Defendant told her he was shot when someone robbed or attempted to rob him, although she could not recall for certain. She testified that she took Defendant to Saint Thomas [Midtown Hospital] for medical treatment, but she could not explain the approximately hour-long delay in their arrival at the hospital. Ms. Matlock testified that she did not see Defendant with a firearm when she picked him up and that she had never seen Defendant with a gun.

Ms. Matlock said that her memory was much better on the day of the shooting than it was at present. She agreed that, in a recorded statement provided to detectives, she did not mention Defendant's saying that someone robbed or attempted to rob him. Ms. Matlock said that she did not remember telling Detective Shannon that she had been on Village Trail before telling him she had been at Waffle House. She said that she did not remember whether she and Defendant had a conversation about what she should tell police if police came to the hospital.

Ms. Matlock said that she had not known Mr. Hawkins or Mr. Armstrong. She identified certain exhibits presented that were from her Facebook page, and she acknowledged that she became Facebook friends with Mr. Armstrong in April 2016 but stated that she did not personally know him.

On cross-examination, the following colloquy took place:

> [DEFENSE COUNSEL:] Okay. As far as you know, [Defendant], the father of your children, has he ever been convicted of a robbery?
>
> [MS. MATLOCK:] He's not going to take anything from nobody. So no.
>
> [DEFENSE COUNSEL:] Has he ever been convicted of a theft?
>
> [MS. MATLOCK:] No.

[DEFENSE COUNSEL:] Okay. Has he ever been convicted of a burglary?

[MS. MATLOCK:] No.

[DEFENSE COUNSEL:] Okay. You said that you've never seen [Defendant] with a gun?

[MS. MATLOCK:] [Never] [e]ver.

Following Ms. Matlock's cross-examination, the State requested that it be allowed to ask Ms. Matlock about Defendant's prior convictions for possession of a firearm. During a jury-out hearing, Ms. Matlock testified that she was aware that Defendant had been convicted of possessing a firearm in 2013 but was unaware of his 2009 conviction for the same offense. The trial court stated that, in her testimony on cross-examination, Ms. Matlock appeared to be "vouching for [the defendant's] character for non-violence and non-propensity towards violence" and that her testimony was putting the issue of "never having a gun in together with never being convicted of felonies towards personal crimes." The trial court stated that Ms. Matlock's testimony was "certainly evidence of a character trait for peacefulness or lack of [a] first aggressor" and that it placed a "misleading" image before the jury. The trial court determined that Defendant was putting forth a character trait that the State should have an opportunity to rebut by asking Ms. Matlock about Defendant's 2013 conviction for possessing a firearm.

On redirect examination, Ms. Matlock testified that she was aware Defendant had previously been convicted for possession of a firearm in 2013.

Dr. Feng Li testified that he was a forensic pathologist and the Chief Medical Examiner for Davidson County. Dr. Li explained that he performed the autopsies of both Mr. Hawkins and Mr. Armstrong. Dr. Li stated that Mr. Armstrong suffered three gunshot wounds, one to his lower back that was fired from at least three to five feet away, a second that was to the left buttocks that exited through the lower abdomen, and a third that was to the back of the right wrist. He agreed that the trajectory of the gunshot wounds to Mr. Armstrong's lower back and left buttocks would be consistent with an individual being bent over at the time of the shooting. Additionally, he agreed that the positioning of the third gunshot wound was consistent with Mr. Armstrong's being in a defensive position. Dr. Li opined that Mr. Armstrong's cause of death was multiple gunshot wounds and that the manner of death was homicide.

Regarding Mr. Hawkins, Dr. Li explained that he suffered one gunshot wound that grazed the skin on the back of his upper left arm before entering his torso. Dr. Li explained

that the bullet injured both of Mr. Hawkins' lungs and the thoracic aorta. He agreed that gunshot wound would be consistent with someone sitting in an automobile at the time of the shooting and that the graze wound would be consistent with a defensive injury. Dr. Li concluded that Mr. Hawkins's cause of death was the gunshot wound and that the manner of death was homicide.

Detective Richard Ford testified that he was the lead detective investigating the double homicide on Bessie Avenue. He stated that, as part the investigation, he conducted numerous interviews but explained that he was immediately suspicious of Defendant due to the circumstances of his hospitalization. Detective Ford said that he also collected various phone records for various cell phones related to the investigation, including Defendant's, Ms. Matlock's, and two of Mr. Armstrong's. He agreed that the phone records did not show that Defendant contacted anyone connected to Mr. Hawkins and Mr. Armstrong.

Detective Ford said that, in conversations with Ms. Risby, she provided him with information about specific drug dealers that Mr. Hawkins and Mr. Armstrong had robbed. She said that Detective Ford should investigate two people, Lil Duty and Chill. Detective Ford found a rap video of Chill's on YouTube in which Defendant appeared. The name "Jones" appeared in the video, and Detective Ford discovered that Defendant's Facebook page was under the name "James Jones." Detective Ford agreed that he did not mention Chill in any of his reports. He explained that Ms. Risby initially gave him a different nickname for one of the robbery victims.

Selicia Evans, an expert in firearms identification, testified that she worked in the MNPD Crime Laboratory. Ms. Evans examined the cartridges cases and cartridges recovered at the scene. She also analyzed bullets taken from Mr. Armstrong's chest and Defendant's arm. She testified that the bullet found in Defendant's arm was fired from the .380 caliber handgun submitted to her. She said that the bullet found in Mr. Armstrong's chest was consistent with the .40 caliber Smith and Wesson cartridges found at the scene. Ms. Evans also determined that the .40 caliber Smith and Wesson cartridges were fired from the same gun. Additionally, Ms. Evans stated that the .380 casings recovered from the scene were fired from the .380 Smith and Wesson handgun that was recovered.

The parties stipulated that Defendant had previously been convicted of a felony drug offense.

William Coffee testified that he was Defendant's cousin and that he went by his stage name, Chill." Mr. Coffee explained that he and Defendant had worked together making rap videos. He agreed that Defendant used the stage name "James Jones." Mr. Coffee testified that he was not a victim of a robbery weeks prior to the Bessie Avenue

shooting. He said that, during much May of 2016, he had been out of the Nashville area performing and promoting his music. He stated that he and Defendant were in Las Vegas from May 26, 2016, to May 29, 2016.

Regarding the day of the shooting, Mr. Coffee explained that June 7, 2016, was his birthday and that several friends threw him a surprise birthday party that day. He said that he was not present on Bessie Avenue at the time of the shooting. Mr. Coffee testified that he had not known Mr. Armstrong and that Mr. Armstrong had never threatened him. He further said that he did not know Mr. Hawkins or Ms. Risby. Mr. Coffee said that Defendant called him on June 7, 2016, around 12:20 p.m., and that Defendant told him he had been robbed and shot. Mr. Coffee agreed that the entirety of the conversation was forty-seven seconds, and he stated that the short length of the conversation did not seem strange to him. He agreed that, although he and Defendant were very close to one another, he did not provide detectives with information about the alleged robbery even after Defendant's arrest. Mr. Coffee admitted that he had six prior felony drug convictions.

Defendant testified that he and Mr. Coffee were cousins, that they were close, and that they made music videos together. Defendant stated that, although he had not known Mr. Hawkins or Ms. Risby, he had known Mr. Armstrong from when they were incarcerated together. Defendant said that, although he and Mr. Armstrong had not been friends, they had been cordial.

Defendant testified that, on the morning of June 7, 2016, he and Ms. Matlock were at his mother's residence on Katie Avenue, a short distance from Bessie Avenue. After Ms. Matlock left the residence in their car to go to Waffle House, he decided to walk to Waffle House to surprise Ms. Matlock. Defendant testified that he did not have a gun when he left his home to walk to Waffle House. Defendant explained that the route he took to Waffle House led him past Mr. Haslett's residence on Bessie Avenue. He said that he saw Mr. Armstrong standing by a truck at the residence and that he called Defendant over to the truck. Defendant said that he did not see Mr. Hawkins at the time. Defendant testified that, when he approached Mr. Armstrong, Mr. Armstrong pointed a gun at him and demanded money. Defendant stated that he asked Mr. Armstrong why he was doing this and then knocked the gun out of Mr. Armstrong's hand. Defendant said that both he and Mr. Armstrong "went for the gun" and that Defendant retrieved it. Defendant testified that, as he was standing up, two to three gunshots were fired in his direction from an unknown source and that his reaction was to duck and fire shots with the gun he retrieved in the direction of Mr. Armstrong. Defendant testified that he did not see who was shooting at him but that, once he secured the gun from Mr. Armstrong, he started firing it. He said that he was aware Mr. Armstrong was not firing at him but that he panicked and fired in the general direction of the shots and Mr. Armstrong. Defendant said that he ran around the truck, where he saw Mr. Hawkins pointing a gun and firing it at him. Defendant explained

- 11 -

that he shot back at Mr. Hawkins and then "ran away." He said that he heard another gunshot as he ran and that he returned fire as he ran from the scene. Defendant said that he did not initially realize that he had been shot. Defendant said that he did not see Mr. Hawkins get out of the truck. He said that, as he was running away, he saw Mr. Armstrong moving towards the house. Defendant said that he ran from the scene because he was afraid and "panicking" and that he thought Mr. Armstrong and Mr. Hawkins were "still after him." He said that he ran through the back yards of nearby houses and that, while he was running, he realized he had been shot. He stated that he then took off his shirt and wrapped it around his arm and that he threw the gun in a trashcan. Defendant recalled hearing a dog barking in one of the yards but did not recall seeing a dog. Defendant continued:

> [A]fter I got rid of the gun and ran, I kept running, and running and running until I knew like wasn't nobody behind me. Like so I don't know what street I ended up on, but I think it was close to Baptist World. That's when I called [Ms. Matlock].

Phone records reflected that Defendant called Ms. Matlock at 11:25 a.m. When Ms. Matlock picked up Defendant, he told her to drive to his father's house. Defendant's father was not home, so he and Ms. Matlock proceeded to the hospital. Defendant said that he and Ms. Matlock only stayed at the house for a few minutes, and he could not explain why they did not get to the hospital until approximately 12:30 p.m. Defendant admitted that he told Ms. Matlock what to say to police. He said that he provided Ms. Matlock the story about her picking him up on Village Trail because he did not want Ms. Matlock "to get incriminated." Defendant said that he and Ms. Matlock did not discuss the situation any further after he got out of the hospital. Defendant testified that he never told Ms. Matlock that he was the victim of a robbery, and he asserted that her trial testimony to the contrary was untrue. Defendant agreed that he called Mr. Coffee while in the car with Ms. Matlock and told Mr. Coffee that he had been robbed and shot but stated that he used "code words" that Ms. Matlock did not know to convey the information. Defendant testified that he was unaware of any bad blood between Mr. Coffee and Mr. Armstrong and Mr. Hawkins. He said that he did not know anything about a robbery involving Mr. Coffee and the two men.

On cross-examination, Defendant admitted that he shot towards Mr. Armstrong, stating, "[I was] trying to like keep him from attacking like coming towards me." Defendant acknowledged that he did not see anything behind Mr. Armstrong that he perceived to be a threat. He said that he did not know if his shots were hitting Mr. Armstrong, saying that he was looking "[a]ll around[,]" "trying to figure out . . . where the gunshots [were] coming from." Defendant said that he did not know who was shooting at him or where the shots were coming from. He admitted that he did not see Mr. Armstrong

with a gun. Defendant acknowledged that he did not call police after he was shot, saying that he had been afraid to call.

In rebuttal, the State recalled Ms. Risby. She testified that Mr. Armstrong had carried an "old gun" in the past but that she had never known Mr. Armstrong to have a .40 caliber weapon. She stated that Chill was a victim of a robbery that Mr. Armstrong and Mr. Hawkins committed in East Nashville, and she identified Mr. Coffee as Chill. She stated that she was sure that Mr. Coffee was the person that she saw robbed weeks prior to the Bessie Avenue shooting. Ms. Risby agreed that she did not provide the name "Chill" to Detective Ford initially but stated that she was later able to identify Chill as the robbery victim based upon Facebook posts. She then provided the information to Detective Ford.

Following deliberations, the jury found Defendant guilty of the lesser-included offense of voluntary manslaughter in count 2; guilty of count 3 aggravated assault resulting in death; guilty of count 5 felon in possession of a firearm; and not guilty in counts 1 and 4.

*Sentencing Hearing*

At a subsequent sentencing hearing, the State introduced Defendant's presentence report and certified copies of Defendant's prior convictions from Davidson County. Detective Peter Finnegan of the MNPD testified that, on January 7, 2019, he was on routine patrol when he noted the odor of marijuana coming from a car in front of him. Detective Finnegan followed the car for several blocks, and then the car pulled into a driveway on Georgia Court and the driver, later identified as Defendant, opened his door and fled from the car. Detective Finnegan stated that he had not initiated a traffic stop, but when Defendant fled, Detective Finnegan approached Defendant's car and observed, in plain view, a large bag of marijuana in the center console. Detective Finnegan also found inside the car fifteen or sixteen small baggies of cocaine, an assortment of pills, a digital scale, and four cell phones. Detective Finnegan ran the tag on the car and contacted Defendant's grandmother, who was the registered owner of the car. Detective Finnegan learned that Defendant drove the car, and upon looking up Defendant's driver's license photograph, he determined that Defendant was the man he saw fleeing the car. He later obtained a warrant for Defendant's arrest based on the incident. Detective Finnegan was presented with the records from Defendant's GPS monitor and agreed that the records were consistent with Defendant's fleeing the location on Georgia Court at 9:11 p.m. on January 7, 2019. He testified that Defendant had pending charges for felony possession of cocaine, felony marijuana possession, and possession of drug paraphernalia.

Brenda Hickman testified that Mr. Armstrong was her grandson and Mr. Hawkins was her son-in-law. Ms. Hickman stated that Mr. Armstrong was "a loving, devoted son,

- 13 -

father, grandson, nephew, cousin and friend" and that he "loved being with his family." She said that Mr. Armstrong had been twenty-three years old at the time of his murder and that he had just learned that he and his girlfriend were expecting a child. Ms. Hickman explained that her daughter, who was Mr. Armstrong's mother and Mr. Hawkins' wife, "struggles every day" and will "[n]ever be the same again." Ms. Hickman asked that the court sentence Defendant to the maximum sentence allowed by law.

Brenda Hawkins testified that she lost both her husband and her first-born son with the deaths of Mr. Hawkins and Mr. Armstrong. Mrs. Hawkins stated that, at the time of the murders, she was the assistant manager at a retail store but that she had been unable to work since the murders. She said that she had to be on medication that she "will have to take for the rest of [her] life." Mrs. Hawkins also said that her stepchildren had "sustained some mental health issues" due to Mr. Hawkins' murder, and she noted how difficult it was that Mr. Armstrong's daughter would have to grow up without him. She asked that the court sentence Defendant to the maximum sentence possible.

Defendant made an allocution statement in which he said that he had been "trying to protect [himself]" from an "attack on [his] life" but that he had "never intended to hurt anyone." He also apologized to the family of Mr. Armstrong and Mr. Hawkins and stated that he "accepted full responsibility for [his] actions[.]"

In sentencing Defendant, the trial court said that it considered the evidence presented at the trial and the sentencing hearing, the presentence report including the findings of the Strong-R risk assessment report, the sentencing purposes and principles embodied in Tennessee Code Annotated sections 40-35-102 and -103, the arguments made as to alternative sentencing, the nature and characteristics of the criminal conduct involved, the evidence and information offered on enhancement and mitigating factors, the available statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses within the state, the allocution of Defendant on his own behalf, and Defendant's potential for rehabilitation or treatment.

Regarding enhancement factors, the trial court found that Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range. The court noted that Defendant had been convicted of eight prior felonies and that "[f]or purposes of enhancing the range, there are six felonies." The court also found that Defendant possessed a firearm during the commission of the offenses. The trial court stated that it did not accredit Defendant's testimony regarding how Defendant possessed the weapon. The court stated, "I think he had a weapon. I just don't accept his testimony. I don't think it was credible at all. I think he had the weapon on him already." The trial court also considered that Defendant had a juvenile delinquency adjudication for felony theft of property, "[s]o [number] 16 would apply." As to mitigating factors, the trial

court found that Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct.

In addition to considering enhancement and mitigating factors, the trial court noted that it had considered Defendant's physical and mental condition, his work and educational history, his character and social history, and the family and community support available to Defendant. The court also considered Defendant's "history of compliance or non-compliance with court-ordered programs, directives or supervision while on probation, bond or other judicial release[,]" stating, "I'm not sure he ever successfully completed a term of release in the community for any crime that he was given that privilege on." The court found that "anytime he was given an alternative sentence, that he violated the terms and conditions of that alternative sentence." The court described Defendant's "self-initiated efforts at rehabilitation" as "non-existent." The court found that, by his own admission, Defendant "was using" marijuana daily. The trial court also noted that Defendant had new arrests since his arrest for the instant offenses, explaining that Defendant had been charged with new felony offenses for possessing cocaine and marijuana. The court concluded that Defendant's criminal history evinced "a clear disregard for the laws and morals of society" and that Defendant had failed at past efforts of rehabilitation. The court recognized that Defendant's sentence "should be the least severe measure necessary to achieve the purposes for which it is being imposed and should be no greater than that deserved for the offense committed."

Based on these considerations, the trial court sentenced Defendant, as a persistent offender, to fifteen years at 75% for voluntary manslaughter and aggravated assault, and the court merged count 2 into count 3. The trial court sentenced Defendant, as a career offender, to twelve years at 60% for felon in possession of a firearm. The court ordered the counts to run concurrently, for a total effective sentence of fifteen years at 75% to serve in confinement.

Defendant filed a timely motion for new trial and amended motion for new trial. Following a hearing, the court entered a written order denying the motion for new trial. This timely appeal follows.

## Analysis

### I. Self-defense instruction

Defendant contends that he is entitled to a new trial based on the trial court's erroneous self-defense jury instruction. He contends that the "unlawful activity" the trial court determined he had been engaged in had no "causal nexus" with his need for self-

defense and that, therefore, the trial court erred when it instructed the jury that he had a duty to retreat. Defendant further contends that, when instructing the jury on his duty to retreat, the trial court improperly modified the jury instructions in a manner "far differently" than that required by *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), resulting in reversible error. The State responds that the trial court properly instructed the jury and, alternatively, that any error in the court's self-defense instruction was harmless beyond a reasonable doubt.

Under Tennessee law, a trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); *see also* Tenn. R. Crim. P. 30(d)(2). This obligation "extends to general defenses, such as self-defense, defense of another, or defense of a habitation." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (footnote omitted). When reviewing jury instructions on appeal to determine whether they are erroneous, this court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

Tennessee's self-defense statute provides, in relevant part:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity[1] and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

---

[1] We note that, in 2021, our legislature amended the self-defense statute to replace the phrase "not engaged in unlawful activity" with the phrase "not engaged in conduct that would constitute a felony or Class A misdemeanor." We will refer to the statutory language in effect at the time of Defendant's trial in this opinion.

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(1)-(2) (2019). Tennessee Code Annotated section 39-17-1322 provides:

A person shall not be charged with or convicted of a violation under this part if the person possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim.

Tenn. Code Ann. § 39-17-1322(a) (2019). Acts committed in self-defense are justified, and self-defense is a complete defense to crimes of violence. *See* Tenn. Code Ann. § 39-11-601 (2019); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

In *Perrier*, our supreme court discussed the application of the "unlawful activity" phrase in the self-defense statute and addressed the issue of whether it is the role of the trial court or the jury to determine if a defendant has met the conditions for the privilege not to retreat. *Perrier*, 536 S.W.3d at 401-03. In deciding the issue, the supreme court found a case from the Alabama Court of Criminal Appeals, *Fuller v. State*, 231 So.3d 1207, 1217-18 (Ala. Crim. App. 2015), "particularly instructive[.]" *Id*. at 402. In that case, the defendant:

asserted that he had acted in self-defense and requested that the trial court instruct the jury that he was entitled to stand his ground when he used deadly force against an alleged attacker. The trial court, outside the presence of the jury, heard evidence that the defendant had a prior felony conviction and subsequently ruled that the defendant was not entitled to a "stand your ground" instruction because he had engaged in unlawful activity by being a felon in possession of a firearm. The trial court then instructed the jury on the law of self-defense, including an instruction that the defendant had a duty to retreat. On appeal, the defendant argued that his possession of a firearm was not unlawful activity, but the appellate court concluded that while a person who cannot otherwise lawfully possess a handgun may nonetheless

- 17 -

take up a handgun in self-defense under Alabama law, the defendant had proactively armed himself and was thus engaged in unlawful activity.

*Id*. (citations omitted).

After reviewing additional cases from Alabama, Arizona, Kentucky, and Louisiana, our supreme court noted that, in each of those states, the trial court "is tasked with the threshold determination of whether a defendant was engaged in criminal activity such that the 'no duty to retreat' instruction would not apply." *Id*. at 402-03. Our supreme court concluded:

This method is compatible with the current structure of our self-defense instruction. As this Court explained in *State v. Hawkins*, self-defense is a general defense and as such it

need not be submitted to the jury unless it is "fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c) [2018]. The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence. To determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. Whenever admissible evidence fairly raises a general defense, the trial court is required to submit the general defense to the jury. From that point, the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply.

*Hawkins*, 406 S.W.3d at 129 (citation omitted).

Within this structure, the trial court makes the threshold determination whether to charge the jury with self-defense, and we conclude that the trial court, as part of that threshold determination, should decide whether to charge the jury that a defendant did not have a duty to retreat. As part of that decision, the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the "no duty to retreat" instruction would not apply. Because the allegedly unlawful activity will oftentimes be uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized by the parties.

*Id*. at 403. The supreme court further held that a defendant's possession of a firearm as a convicted felon was encompassed within the "unlawful activity" contemplated by the self-defense statute. *Id.* at 404. The supreme court noted, however, a duty to retreat does not mean that a person cannot defend himself; "[a] defendant may still defend himself even to the point of using deadly force[] and . . . may be acquitted of a weapons offense if a jury finds that his self-defense was justifiable." *Id.* (citing Tenn. Code Ann. §§ 39-11-611; 39-17-1322).

After our supreme court issued *Perrier*, the Tennessee Pattern Jury Instruction for self-defense was changed to comply with *Perrier*. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b). If the trial court determines that the defendant was engaged in unlawful activity, the court must omit the portion of the jury instruction that states: "[t]he defendant would also have no duty to retreat before [threatening][using] force." *Id.*

In this case, after the State rested its case-in-chief, the trial court held a jury charge conference in which it discussed the self-defense instruction. The trial court stated, "I mean, our Supreme Court clearly indicated, in *Perrier* . . . that the carrying of a weapon by a convicted felon is unlawful activity and therefore [Defendant] had a duty to retreat." The trial court continued, "What they didn't really clarify is whether or not there has to be some . . . nexus, cause, causation between the unlawful activity and the events that occurred. [The *Perrier* Court] said well, the facts in this case are so obvious that it doesn't matter." The trial court also noted that it had to determine "whether or not there was an unlawful activity" and then remarked, "Which clearly, there was an unlawful activity."[2]

Based on its finding that Defendant was engaged in unlawful activity, the trial court instructed the jury that Defendant had a "duty to retreat before threatening or using force intended or likely to cause his death or serious bodily injury" and that, if after Defendant's

> reasonable efforts to retreat, he had a reasonable belief that he was in imminent danger of death or serious bodily injury, the danger creating the belief of death or serious bodily injury was real or honestly believed to be real at the time and the belief was founded upon reasonable grounds, then he would be justified in threatening or using force intended or likely to cause death or serious bodily injury.

---

[2] Defense counsel responded, "I guess, all I'm saying is we may need to revisit this after the end of all proof." However, this appears to be the extent of the discussion and the trial court's findings on whether Defendant was "engaged in unlawful activity" such that the "no duty to retreat" instruction would not apply. The court did not have a hearing on the issue, as suggested by *Perrier*, and it did not specify when it found Defendant was engaging in the unlawful activity.

On appeal, Defendant contends that being a felon in possession of a firearm, standing alone, is insufficient to trigger the forfeiture of the "no duty to retreat" and that the trial court erred when it altered the jury instruction based on this reasoning. He argues that there must be a link between a defendant's being "engaged in unlawful activity" and the confrontation that led to the defendant's use of force before a trial court can instruct the jury that the defendant had a duty to retreat.

The court in *Perrier* found it unnecessary to address whether the "unlawful activity" by a defendant had to have such a "causal nexus" to the defendant's perceived need to defend himself. *Id.* In *State v. Tyshon Booker*, however, a panel of this court held that "a causal nexus between a defendant's unlawful activity and his or her need to engage in self-defense is necessary before the trial court can instruct the jury that the defendant had a duty to retreat." No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at * 27 (Tenn. Crim. App. Apr. 8, 2020), *perm. app. granted* (Tenn. Sept. 16, 2020).[3] The court in *Tyshon Booker* concluded that the "engaged in unlawful activity" phrase in the self-defense statute was "an elaboration of the 'without fault in provoking the confrontation' requirement from the true man doctrine" and that the "without fault" language did not refer "to fault in general, but rather, fault in causing the confrontation at issue." *Id.* at *26. Several subsequent panels of this court have applied a causal nexus requirement. *See State v. Yancey Lee Williams II*, No. M2019-00091-CCA-R3-CD, 2020 WL 4345504, at *15 (Tenn. Crim. App. July 29, 2020) (concluding that the defendant's unlawful activity of selling drugs was causally related to the shooting when the shooting resulted in part over allegations of underpayment for the drugs), *no perm. app. filed*; *State v. Shannon Bruce Foster*, No. E2020-00304-CCA-R3-CD, 2021 WL 3087278, at *24 (Tenn. Crim. App. July 22, 2021) (concluding that the defendant's act of possessing a handgun with the intent to go armed had a causal relationship to the shooting when the defendant brought the gun to the victim's house after the victim assaulted the defendant's mother), *perm. app. denied* (Tenn. Dec. 8, 2021); *State v. Antonio Maurice Jackson*, No. M2020-01098-CCA-R3-CD, 2022 WL 1836930, at *29 (Tenn. Crim. App. June 3, 2022) (concluding that the defendant's unlawful conduct of engaging in a drug transaction was causally linked to the confrontation with the victim that led to the defendant's need to engage in self-defense), *perm. app. filed*; *State v. Vana Mustafa*, No. M2020-01060-CCA-R3-CD, 2022 WL 2256266, at *24 (Tenn. Crim. App. June 23, 2022) (determining that the trial court correctly instructed the jury that the defendant had a duty to retreat because a nexus existed between the defendant's unlawful activity of engaging in a drug transaction while armed with a handgun and his perceived need to engage in self-defense); *perm. app. filed*; *State v. Kevin Wayne Newson*, No. M2021-00444-CCA-R3-CD; 2022 WL 2251303, at *9-10 (Tenn. Crim. App. June 23,

---

[3] The Tennessee Supreme Court granted the defendant's Rule 11 application in *Tyshon Booker* to address the issue of whether a sentence of life imprisonment for a juvenile in Tennessee violates the United States or Tennessee Constitutions. At the time of the filing of this opinion, the case has been briefed and argued before the supreme court, and a decision is pending.

2022) (stating that "the *Booker* Court's observation that a defendant's status will rarely 'produce a situation' does not apply under the facts in this case, in which [the victim] would still be alive were it not for the fact that the Defendant, a convicted felon, was in possession of a weapon that night").[4]

We agree with the reasoning in *Tyshon Booker* and likewise conclude that, when determining whether to instruct a jury that a defendant had "no duty to retreat," a trial court must consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity, *Perrier*, 536 S.W.3d at 403, and that a "causal nexus" exists between the defendant's being engaged in unlawful activity and his or her need to engage in self-defense. *Tyshon Booker*, 2020 WL 1697367, at * 27; *see also Vana Mustafa*, 2022 WL 2256266, at *24; *Antonio Maurice Jackson*, 2022 WL 1836930, at *29; *Shannon Bruce Foster*, 2021 WL 3087278, at *24; *Yancey Lee Williams II*, 2020 WL 4345504, at *15. If there is no "causal nexus" between the defendant's engagement in unlawful activity and the need to engage in self-defense, then the court must instruct the jury that the defendant had "no duty to retreat."

Turning to this case, the trial court found that Defendant was engaged in the unlawful activity of carrying a firearm while being a convicted felon, but the court did not specify *when* it believed Defendant possessed the weapon. At the motion for new trial hearing, the trial court questioned whether there were "any reasonable inferences from the totality of the evidence presented in this case that [Defendant] came to the -- walked down that street with a gun in hand[,]" and the State responded that there was a "circumstantial inference that [Defendant] could have brought a gun" to the scene.

Defendant testified, however, that he did not have a gun when he left his home to walk to Waffle House. He said that, while walking down Bessie Avenue, Mr. Armstrong called him over. When he approached Mr. Armstrong, Mr. Armstrong pointed a gun at him and demanded money. Defendant asked Mr. Armstrong why he was doing this and knocked the gun out of Mr. Armstrong's hand. Defendant testified that both he and Mr. Armstrong "went for the gun" and that Defendant was able to retrieve it. He then heard gunshots. Defendant testified that he did not see who was shooting at him but that, once he secured the gun from Mr. Armstrong, he started firing it. He said that he did not know

---

[4] We note that two panels of this court have applied *Perrier's* holding that a felon in possession of a firearm is engaged in "unlawful activity" without further inquiry into whether there was a causal nexus between a defendant's unlawful activity and his need to engage in self-defense. *See State v. Brian Howard*, No. W2020-00207-CCA-R3-CD, 2021 WL 144235, at *5 (Tenn. Crim. App. Jan. 15, 2021), *perm. app. denied* (Tenn. May 14, 2021); *State v. Michael Dominic Sales*, No. M2017-01116-CCA-R3-CD, 2020 WL 5568621, at *15 (Tenn. Crim. App. Sept. 17, 2020), *perm. app. denied* (Tenn. Jan. 13, 2021). In these cases, however, it does not appear that the defendants raised the issue of whether they had a duty to retreat because they were engaged in "unlawful activity."

- 21 -

where the gunshots were coming from and that he only saw Mr. Armstrong at that time. Defendant said that he ran from the scene with the gun and threw the gun in a trashcan before calling Ms. Matlock. Ms. Matlock testified that she had never seen Defendant with a gun and that he did not have one when she picked him up that day.

None of the State's witnesses testified that Defendant possessed a gun prior to the confrontation with Mr. Armstrong and Mr. Hawkins. Mr. Obuchowski, the neighbor who later identified Defendant in a photographic lineup, testified that he saw Defendant with a gun after the shooting while Defendant was running through a neighbor's back yard. When law enforcement arrived at the scene, they found a .380 caliber handgun in Mr. Hawkins' hand. Officers collected twelve total cartridges fired from two different guns; eight cartridges were from a .40 caliber Smith and Wesson and four cartridges were fired from the .380 caliber gun found in Mr. Hawkins' hand. Ms. Risby testified that Mr. Armstrong always carried a gun and that he and Mr. Hawkins often robbed people together. She testified that she was present during one robbery committed by Mr. Armstrong and Mr. Hawkins about two weeks before their deaths. She stated that both Mr. Armstrong and Mr. Hawkins had guns during the robbery and that they pointed their guns at the man they were robbing. She testified that Mr. Armstrong typically carried a .380 caliber gun but that she knew him to carry another one, which she described as "an old gun." She stated, however, that she never heard Mr. Armstrong refer to this gun as a .40 caliber. Thus, the facts in this case are distinguished from cases wherein a defendant who cannot lawfully possess a handgun has *proactively* armed himself and has thus been found to have engaged in unlawful activity. *See e.g., Kevin Wayne Newson*, 2022 WL 2251303, at *1; *Vana Mustafa*, 2022 WL 2256266, at *24; *Shannon Bruce Foster*, 2021 WL 3087278, at *24; *Fuller*, 231 So.3d at 1213.

Based on the facts in this case, we conclude that the State failed to produce clear and convincing evidence that Defendant was engaged in unlawful activity such that the "no duty to retreat" instruction would not apply. *Perrier*, 536 S.W.3d at 403. Furthermore, even if the evidence did establish that Defendant was in possession of a weapon when he arrived at the scene, the evidence did not establish a "causal nexus" between this unlawful activity and Defendant's need to engage in self-defense. *See Tyshon Booker*, 2020 WL 1697367, at * 27. As noted in *Tyshon Booker*, "status offenses" (such as being a felon in possession of a firearm) "will rarely qualify as unlawful activity because a person's status alone cannot provoke, cause, or produce a situation." *Id.* Thus, we conclude that the trial court erred when it instructed the jury that Defendant had a duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury.

The State argues that any error in the trial court's self-defense instruction was harmless beyond a reasonable doubt. The State asserts that, "[g]iven that Mr. Armstrong

no longer had a weapon and was trying to flee, any belief on [D]efendant's part that he was in imminent danger of death or serious bodily injury was not reasonable."

"In order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Perrier*, 536 S.W.3d at 404, n.8 (quoting *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013)) (internal quotation marks omitted). "[T]he touchstone of this inquiry is whether a rational trier of fact could interpret the proof at trial in different ways." *Cecil*, 409 S.W.3d at 610 (citing *State v. White*, 362 S.W.3d 559, 579 (Tenn. 2012)). When evidence regarding an erroneous instruction "could be interpreted in different ways," this court cannot conclusively say that a properly instructed jury would not have decided differently. *Id.*

Here, Defendant testified that Mr. Armstrong pointed a gun at him and demanded money. Defendant knocked the gun out of Mr. Armstrong's hand, and then both men "went for" the gun. Defendant said that he retrieved the gun and that, as he was standing back up, someone began shooting at him. He said that two to three gunshots were fired in his direction from an unknown source and that his reaction was to duck and fire shots in the direction of Mr. Armstrong with the gun he retrieved. He said that he was aware Mr. Armstrong was not firing at him but that he fired in the general direction of the shots and Mr. Armstrong. Defendant said that he ran around the truck where he saw Mr. Hawkins pointing a gun and firing it at him. Defendant shot back at Mr. Hawkins and then "ran away." He said that he heard another gunshot and that he returned fire as he ran from the scene. During the exchange, Defendant was shot in the arm with the .380 caliber gun found in Mr. Hawkins' hand. A reasonable jury could find that Defendant used force intended or likely to cause death or serious bodily injury when Defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury; that the danger creating the belief of imminent death or serious bodily injury was real; and that the belief of danger was founded upon reasonable grounds. *See* Tenn. Code Ann. § 39-11-611(b)(2) (2019). Because a reasonable jury could have accepted Defendant's claim that he acted in self-defense in shooting Mr. Armstrong, the jury instruction error is not harmless beyond a reasonable doubt. We, therefore, reverse Defendant's convictions and remand for a new trial.

Even though we are remanding for new trial based on the erroneous jury instruction, we will address the other issues raised in the event of further appellate review or for the purposes of a new trial.

Defendant argues that the trial court abused its discretion by preventing him from cross-examining Ms. Risby regarding a phone conversation that she overheard between Mr. Armstrong and Mr. Hawkins in which they discussed a robbery of certain individuals. Defendant contends that Rule 405(b) allows substantive proof of specific acts where character is an element of a cause of action or a defense and that he "needed to demonstrate that Mr. Armstrong and Mr. Hawkins were the first aggressors." Defendant notes that Rule 405(a)(2) requires only that there be a "reasonable factual basis" for the admissibility of this evidence and asserts that, by requiring clear and convincing evidence of the specific act, the trial court applied an incorrect legal standard. Defendant further asserts that the court's ruling deprived him of the constitutional right to confront the witness.

The State responds that Defendant waived this issue because he did not raise it in his motion for new trial and that, even if the issue was not waived, "the trial court properly limited cross-examination after finding that [D]efendant failed to establish that a reasonable factual basis existed for the inquiry[.]"

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id*.

When a defendant relies on a theory of self-defense and that the alleged victim of a violent crime was the first aggressor, the defense may present evidence of the victim's prior history of violent conduct. *State v. Ruane*, 912 S.W.2d 766, 781-82 (Tenn. Crim. App.

1995), *abrogated on other grounds by State v. Rogers*, 992 S.W.2d 393, 401 (Tenn. 1999). "There is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." *Id*. at 779. When the defendant's fear of the victim is relevant and the defendant is aware of the prior acts, the defendant may testify concerning his knowledge of the victim's violent conduct. *State v. Hill*, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994) (citing *Williams v. State*, 565 S.W.2d 503, 505 (Tenn. 1978)). Such evidence constitutes substantive evidence of the defendant's subjective state of mind. *See State v. Chancy Jones*, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *7 n.6 (Tenn. Crim. App. Apr. 5, 2012).

However, "[t]he defendant need not be aware of the victim's prior violent acts at the time of the alleged self-defense in order to use the evidence for the limited purpose of corroborating the defendant's self-defense claim." *Chancy Jones*, 2012 WL 1143583, at *7 (citing *Ruane*, 912 S.W.2d at 781-782). Such evidence is only admissible as corroborative evidence and not substantive proof, and, thus, the admission of the evidence is not governed by Tennessee Rules of Evidence 404(a)(2) and 405. *See id*.; *Ruane*, 912 S.W.2d at 781-82; *see also* Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[5][d] (6th ed. 2011) (stating that the use of the victim's prior acts to corroborate the defendant's claim that the victim was the first aggressor "is not covered by Rule 404(a)(2), which deals with substantive rather than corroborative proof" and that, as a result, "Rule 405(a) and (b) also do not appear to apply"). This court has recognized three prerequisites to the introduction of corroborative evidence of the victim's first aggressor tendencies: (1) the issue of self-defense must be raised by the proof and not simply by statements of counsel; (2) there must be a factual basis underlying the defendant's claim that the victim had first aggressor tendencies; and (3) the trial court must determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice. *State v. Christopher W. Gadsden*, No. M2019-01385-CCA-R3-CD, 2020 WL 6791251, at *11 (Tenn. Crim. App. Nov. 19, 2020) (citing *Ruane*, 912 S.W.2d at 781), *perm. app. denied* (Tenn. Mar. 17, 2021).

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Tennessee Constitution similarly provides, "That in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. 1, § 9. Rights under the Confrontation Clause of the United States Constitution and the protections afforded by the Tennessee Constitution are co-extensive. *Davis*, 466 S.W.3d at 68. A defendant's right to confront witnesses against him includes the right to meaningful cross-examination. *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2000). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound

discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995).

As the State noted, Defendant did not argue in his motion for new trial that the trial court erred by preventing him from cross-examining Ms. Risby regarding a phone conversation that she overheard between Mr. Armstrong and Mr. Hawkins in which they discussed a robbery of certain individuals. Defendant argued, instead, that the trial court "erred by not allowing the defendant to cross examine . . . [Ms.] Risby regarding her statement, 'I feel like they were about to rob someone and they ended up getting robbed.'" Additionally, Defendant did not argue in his motion for new trial that the trial court's limitation on the cross-examination of Ms. Risby violated his right of confrontation. It is well-settled that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for new trial; otherwise, such issues will be treated as waived." Tenn. R. App. P. 3(e); *see also Harbison*, 539 S.W.3d at 164 (stating that a defendant must raise an issue in a motion for new trial to preserve it for appeal); *State v. Parker*, 350 S.W.3d 883, 900 (Tenn. 2011) (concluding that the defendant had waived challenge to trial court's evidentiary ruling by failing to include it in the motion for new trial). We conclude that Defendant has waived our consideration of these issues by failing to specifically state them in his motion for new trial.

Although Defendant waived plenary review of these issues, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Here, Defendant has not demonstrated that a clear and unequivocal rule of law was breached, that a substantial right of his was adversely affected, or that consideration of the

alleged errors is necessary to do substantial justice. *Adkisson*, 899 S.W.2d at 640-41. Ms. Risby's testimony at the pretrial hearing failed to establish the circumstances and content of the telephone conversation or that it was relevant to the shooting. Moreover, the trial court admitted evidence of two other robberies that Mr. Armstrong and Mr. Hawkins committed prior to the shooting for the purposes of corroborating Defendant's assertion that they were the first aggressors. Defendant has failed to show that the trial court committed plain error, and he is not entitled to relief.

## III. Necessity instruction

At the close of proof, Defendant requested that the trial court instruct the jury with Tennessee Pattern Jury Instruction 40.05 on the defense of necessity, arguing that it had been fairly raised by the proof relating to Defendant's possession of a firearm as a convicted felon. The trial court denied the request, citing *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998), for the proposition that necessity "has traditionally been used appropriately when the extreme situation is brought on by something other than a human act." Defendant asserts that the trial court erred by failing to instruct the jury on necessity as to the offense of felon in possession of a firearm as charged in count 5. He argues that the defense was fairly raised at trial as his "entire course of conduct . . . based on his uncontroverted testimony at trial, demonstrated that he possessed the firearm out of necessity in order to avoid a greater harm." He further argues that the error is not harmless and that, if the jury had been instructed on necessity, it would have found him not guilty on count 5. The State responds that the trial court properly declined to instruct the jury on the defense of necessity.

Tennessee Pattern Jury Instruction 40.05 provides the following in relation to the defense of necessity:

> Included in the defendant's plea of not guilty is [his] [her] plea of necessity as a defense.
>
> It is a defense to the offense [charged] [included] that:
>
> (1) the defendant reasonably believed the conduct was immediately necessary to avoid imminent harm; and
>
> (2) the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

- 27 -

"Imminent" means near at hand; on the point of happening.

"Ordinary standards of reasonableness" means the care an ordinary, reasonable, prudent person would have taken under same or similar circumstances.

If evidence is introduced supporting the defense of necessity, the burden is on the state to prove beyond a reasonable doubt the defendant did not act out of necessity.

. . . .

If from all the facts and circumstances you find the defendant acted out of necessity, or if you have a reasonable doubt whether [he] [she] acted out of necessity, then you must find the defendant not guilty.

T.P.I.—Crim. 40.05 (22nd ed. 2018).

The common law defense of necessity, like self-defense, is grouped with the defenses that provide a justification excluding criminal responsibility and are codified in Part 6 of Chapter 11, Title 39 of our Code. Tennessee Code Annotated section 39-11-609 provides:

Except as provided in §§ 39-11-611—39-11-616, 39-11-620 and 39-11-621, conduct is justified, if:

(1) [t]he person reasonably believes the conduct is immediately necessary to avoid imminent harm; and

(2) [t]he desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

Tenn. Code Ann. § 39-11-609 (2019). The Comments of the Tennessee Sentencing Commission concerning section 39-11-609 state:

This section codifies the common law defense of necessity. It excuses criminal liability in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation. For example, the necessity defense would bar a trespass conviction for a hiker, stranded in

a snowstorm, who spends the night in a vacant cabin rather than risking death sleeping in the open.

The defense is limited to situations: (1) where the defendant acts upon a reasonable belief that the action is necessary to avoid harm; and (2) where the harm sought to be avoided is clearly greater than the harm caused by the criminal act. The defense is further limited in application to those offenses where it is not expressly excluded by statute.

Subdivisions (1) and (2) contemplate a balancing between the harm caused by the conduct constituting an offense, and the harm the defendant sought to avoid by the conduct. If the harm sought to be avoided was, by ordinary standards of reasonableness, clearly greater than the harm actually caused (the offense), the defendant's conduct causing the offense is justified.

Tenn. Code Ann. § 39-11-609, Sent'g Comm'n Comments.

"The defense of necessity is predicated on the theory that it is better to allow a crime to go unpunished where the crime was committed to avoid a greater and more serious harm[.]" *Marquis D. Hendricks v. State*, No. E2016-02123-CCA-R3-PC, 2017 WL 3174074, at *7 (Tenn. Crim. App. July 26, 2017) (citing David Louis Raybin, *Tennessee Practice: Criminal Practice & Procedure* § 28:59 (2016)), *perm. app. denied* (Tenn. Nov. 16, 2017). Necessity is not an affirmative defense that must be proven by a defendant. *State v. Culp*, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994). Necessity provides a general defense which must only be fairly raised by the proof before being considered by the trier of fact, and any reasonable doubt on the issue requires an acquittal. *State v. Cole-Pugh*, 588 S.W.3d 254, 260 (Tenn. 2019); Tenn. Code Ann. § 39-11-203(c), (d) (2019).

Defendant argues that his case is analogous to a case decided by the Tennessee Supreme Court several weeks after Defendant's trial, *State v. Cole-Pugh*. In that case, the defendant was convicted of being a felon in possession of a firearm after he became involved in a physical altercation with two men inside of a convenience store. *Id*. at 255, 261. When a gun fell from the jacket of one of the men, who was described by an eyewitness as the aggressor, the man and his friend both grappled with the defendant for the gun. *Id*. at 261. The defendant obtained the weapon, and the aggressor stood up and ran outside the store. *Id*. The defendant walked outside carrying the gun pointed downward and without pointing it at anyone. *Id*. The defendant then walked back inside the store and exited again. *Id*. Soon thereafter, a witness heard gunshots and discovered that the defendant's girlfriend had been shot by a different armed individual. *Id*. The witness said that, when the defendant exited the store, he did not appear to have possession of the gun anymore. *Id*. The supreme court noted, however, that the weapon was never

recovered by police, leaving the question of when and how the defendant lost possession of the handgun unanswered. *Id.* at 263.

In determining that the defense of necessity was fairly raised by the evidence and that the trial court erred in refusing to instruct the jury accordingly, the supreme court concluded:

> Viewing the evidence in the light most favorable to the defense and drawing all reasonable inferences therefrom, as we must, several reasonable inferences supporting the defense of necessity can be drawn from these facts: (1) a jury could have inferred that the defendant reasonably believed (had a sensible belief that results from using reason) that the conduct (obtaining possession of the firearm) was immediately necessary for him to avoid imminent harm (having the firearm reclaimed by the aggressor and used against him); and that (2) the urgency of avoiding the harm (having the firearm used against him) clearly outweighed the harm sought to be prevented by the law (prohibiting possession of a handgun by a felon). Moreover, the necessity of the situation was further established by the fact that once the original handgun was out of play, a second firearm was brandished and the imminent harm actually occurred.

*Id.* at 261-262.

We agree with Defendant that *Cole-Pugh* is instructive and conclude that the trial court in this case likewise erred by failing to instruct the jury on the general defense of necessity. A jury could have inferred that Defendant reasonably believed that his obtaining possession of the gun used by Mr. Armstrong was immediately necessary to avoid the imminent harm of Mr. Armstrong regaining control of the gun and continuing to use it against Defendant and that the urgency of avoiding Mr. Armstrong's use of the gun against Defendant clearly outweighed the harm sought to be prevented by the law prohibiting Defendant's possession of a gun as a convicted felon. Additionally, a jury could have inferred that the necessity of Defendant's possession of the gun was further established by the fact that Mr. Hawkins was shooting at (and shot) Defendant as he attempted to run from the scene. Viewing the evidence in the light most favorable to Defendant and drawing all reasonable inferences in his favor, Defendant demonstrated that the threat against him was imminent and required immediate action on his part; thus, the defense of necessity was fairly raised by the proof. *See id.* at 260; *State v. Lafaris Brown*, No. E2019-02222-CCA-R3-CD, 2021 WL 1625414, at *13 (Tenn. Crim. App. Apr. 27, 2021) (citing *Davenport*, 973 S.W.2d at 288); *see also United States v. Perez*, 86 F.3d 735, 737 (7th Cir. 1996) ("The defense of necessity will rarely lie in a felon-in-possession case *unless* the ex-felon, not

being engaged in criminal activity, does nothing more than grab a gun with which he or another is being threatened[.]" (Emphasis added)).

The State argues that any error by the trial court was harmless beyond a reasonable doubt because it presented evidence that Defendant continued to possess and use the firearm "well after the shooting had concluded." The State notes that two witnesses saw Defendant fleeing the scene with the gun in his hand and that one witness saw him point the gun at a dog as he ran through a yard. The State contends that, once the threatened harm had ended, Defendant "had the opportunity to dispossess himself of the firearm" and did not do so, and as such, no reasonable jury would have determined that Defendant was acting out of necessity.

However, Defendant testified that he was being shot at as he ran from the scene and that he was afraid and "panicking" because he thought Mr. Armstrong and Mr. Hawkins were "still after him." He said that he ran through the back yards of nearby houses and that, while he was running, he realized he had been shot. He stated that he then took off his shirt and wrapped it around his arm and threw the gun in a trashcan. Defendant recalled hearing a dog barking in one of the yards but did not recall seeing a dog. Defendant said that he stopped near Baptist World Center Drive and called Ms. Matlock. Ms. Baker testified that the shooting began when she answered her phone at 11:23 a.m., and phone records established that Defendant called Ms. Matlock two minutes later, at 11:25 a.m. A reasonable jury could have concluded that Defendant was still acting out of necessity as he possessed the gun while he ran from the scene and that he dispossessed himself of the gun by placing it inside a trashcan within minutes of the shooting.

The State has not shown that the trial court's error in failing to instruct the defense of necessity was harmless beyond a reasonable doubt. *See Cole-Pugh*, 588 S.W.3d at 264. Accordingly, we reverse Defendant's conviction for felon in possession of a firearm in count 5 and remand for a new trial.

*IV. Sentencing*

Defendant contends that the trial court abused its discretion by imposing the maximum, within-range sentence of fifteen years for aggravated assault and voluntary manslaughter. The State responds that the trial court considered the purposes and principles of the Sentencing Act before sentencing Defendant and did not abuse its discretion by imposing a fifteen-year sentence.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of

discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2019).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2019); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2019), Sentencing Comm'n Cmts.

Here, the trial court considered the factors set out in section 40-35-210 and stated on the record the reasons for Defendant's sentences. Thus, the trial court's sentencing decisions are entitled to a presumption of reasonableness, and we will not reverse absent an abuse of discretion.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2019).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2019); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

In this case, the sentences imposed by the trial court were within the applicable range of punishment for each conviction.[5] The range of punishment for a Range III persistent offender convicted of voluntary manslaughter and aggravated assault resulting in death, both Class C felonies, is ten to fifteen years. *See* Tenn. Code Ann. §§ 40-35-112(c)(3); 39-13-211(b); 39-13-102(e)(1)(A)(iii) (2019).

In setting the sentence length for each conviction, the trial court found that several enhancement factors applied to Defendant. Specifically, the court considered that Defendant had a previous history of criminal convictions or criminal behavior, in addition to that necessary to establish the appropriate range; that Defendant possessed or employed a firearm during the commission of the offense; and that Defendant was adjudicated to have committed a delinquent act as a juvenile that would constitute a felony if committed by an adult. *See* Tenn. Code Ann. § 40-35-114(1), (9), (16) (2019). The evidence clearly supports the trial court's consideration of these enhancement factors. The record reflects that Defendant had prior convictions for the following offenses: two counts of felon in possession of a handgun; two counts of evading arrest in a motor vehicle, two counts of possession of more than a half ounce of marijuana for resale; two counts of possession of less than 0.5 grams of cocaine for resale; vandalism under $500; simple possession of cocaine; resisting arrest; driving under the influence; possession of drug paraphernalia; and

---

[5] Defendant does not challenge his sentence for felon in possession of a firearm.

simple possession of marijuana. Defendant also admitted to using marijuana daily. The record also reflects that, as a juvenile, Defendant was adjudicated delinquent for felony theft of property. Finally, the evidence at trial established that Defendant used a .40 caliber gun to shoot and kill Mr. Armstrong.

The trial court did not abuse its discretion by sentencing Defendant to a within-range sentence of fifteen years for both voluntary manslaughter and aggravated assault. He is not entitled to relief on this issue.

## V. Sufficiency of the evidence

Defendant asserts that the State presented insufficient evidence to support his convictions for aggravated assault and voluntary manslaughter. He argues that the jury "returned inconsistent verdicts that cannot not be supported in light of [his] argument of self-defense that was accepted by the jury." Defendant contends that the jury believed his conduct was justified as self-defense in counts 1 and 4, thereby barring conviction, and that the jury could not then determine that his claim of self-defense was invalid "for the same act that was charged differently [in counts 2 and 3.]" The State responds that the evidence is sufficient to support Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act

in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2016). Whether adequate provocation exists so as to support a conviction for voluntary manslaughter is a question for the jury. *See State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001) ("[W]hether a knowing killing resulted from 'a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner' is a jury question."); *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995) ("Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury.").

As charged in this case, aggravated assault occurs when a person intentionally or knowingly commits an assault, and the assault results in the death of another. Tenn. Code Ann. § 39-13-102(a)(1)(A)(ii) (2016). Assault occurs when a person "[i]ntentionally, knowingly, or recklessly causes bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1) (2016).

We note initially, as did the State in its brief, that Defendant's entire challenge to the sufficiency of the evidence "rests on the erroneous contention that the jury convicted him of offenses related to the deaths of Mr. Armstrong *and* Mr. Hawkins." However, the record is clear that the jury acquitted Defendant on counts 1 and 4, in which Mr. Hawkins was the named victim. The jury convicted Defendant of the lesser-included offense of voluntary manslaughter of Mr. Armstrong in count 2 and of aggravated assault resulting in death of Mr. Armstrong in count 3. By its verdict, the jury apparently accepted Defendant's self-defense claim with respect to Mr. Hawkins but not with respect to Mr. Armstrong. Thus, there was no inconsistency in the verdicts.

Moreover, the evidence is sufficient to support Defendant's convictions for voluntary manslaughter and aggravated assault resulting in death. Based upon the evidence presented at trial, a rational trier of fact could have found that Defendant was walking down Bessie Avenue when he was called over by Mr. Armstrong, that Mr. Armstrong pointed a gun at him and demanded money, and that Defendant wrestled the gun away from Mr. Armstrong. The jury could have reasonably found that, once Defendant had possession of the gun, Mr. Armstrong no longer posed a threat to Defendant and that, either the confrontation with Mr. Armstrong or Mr. Armstrong's prior robbery of Mr. Coffee, constituted "adequate provocation" for Defendant to shoot Mr. Armstrong. Further, a rational trier of fact could have found that Defendant acted intentionally, knowingly, or recklessly when he shot at Mr. Armstrong and that Mr. Armstrong's three gunshot wounds were bodily injury that resulted in his death.

When viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of voluntary manslaughter and aggravated assault

resulting in death beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Defendant is not entitled to relief on this claim.

*VI. Cross-examination of Ms. Matlock regarding Defendant's prior conviction*

Defendant contends that the trial court erred when it permitted the State to question Ms. Matlock about Defendant's prior conviction for possession of a firearm after Ms. Matlock testified on cross-examination that she had never seen Defendant with a gun. Defendant asserts that the trial court erred in both its review of Ms. Matlock's testimony and its assessment that Defendant "opened the door" to the State's line of questioning. The State responds that the trial court did not abuse its discretion by allowing the State to question Ms. Matlock about Defendant's prior conviction after finding that Defendant's cross-examination of Ms. Matlock opened the door to the inquiry.

Evidence that is otherwise inadmissible may become admissible if the defendant "opens the door" by putting the issue into controversy. *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). Our supreme court has explained, "When a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Id.* (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039.1). This court has held previously that "'[i]rrespective of admissibility under Rule 609 [of Tennessee Rules of Evidence], a conviction may be used to contradict a witness who "opens the door" and testifies on direct examination that he or she has never been convicted of a crime, or to counter some other facet of direct testimony.'" *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.1 (3d ed. 1995)).

In this case, the trial court found that Defendant's cross-examination of Ms. Matlock elicited testimony about Defendant's character for peacefulness and non-violence. Defendant questioned Ms. Matlock about her knowledge of Defendant's criminal history—wherein she stated that he had never been convicted of robbery, burglary, or theft—and then asked if she had ever seen him with a gun. Ms. Matlock reiterated that she had never seen Defendant with a gun, despite her knowledge of Defendant's 2013 conviction for possessing a firearm. The trial court concluded that the questioning was designed to give the jury the impression that Defendant was a non-violent person who did not possess weapons and, thus, did not possess one on the day of the shooting. We agree with the trial court that Ms. Matlock's testimony essentially described Defendant as a nonviolent law-abiding citizen and that Defendant opened the door to the State's question about his relevant criminal history, *i.e.*, his illegal possession of a firearm in 2013. *See State v. William Jason Harris*, No. M2014-00375-CCA-R3-CD, 2015 WL 3563076, at *8 (Tenn. Crim. App. June 9, 2015) (concluding that the defendant opened the door to questioning

about his prior criminal history when a witness's testimony "characterized [the d]efendant as a nonviolent law-abiding citizen"), *no perm. app. filed*.

The trial court properly allowed the State to question Ms. Matlock regarding her knowledge of Defendant's prior conviction for illegally possessing a firearm. Defendant is not entitled to relief on this claim.

### **Conclusion**

Based on the foregoing, we reverse the judgments of the trial court and remand for a new trial.

_____
ROBERT L. HOLLOWAY, JR., JUDGE